# EXHIBIT D

WILLIAM SELMER, DDS                                    February 1, 2013
GEVAS v. McCANN

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


DAVID C. GEVAS,                      )

            Plaintiff,       )

    -vs-                      ) No. 08 C 3074

TERRY McCANN, et al.,                )

            Defendants.      )


        The deposition of WILLIAM SELMER, DDS,
called for examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before V. LINDA BOESCH, a Notary
Public within and for the County of DuPage, State of
Illinois, and a Certified Shorthand Reporter, CSR No.
84-3108, of said state, at Suite 5100, 111 South
Wacker Drive, Chicago, Illinois, on February 1, 2013,
at 11:08 a.m.

WILLIAM SELMER, DDS                                    February 1, 2013
GEVAS v. McCANN

Page 20

1    doesn't work all the time.  So they may still

2    experience discomfort as you're trying to take the

3    tooth out.

4         Q.    Got it.  So what would you do in that

5    situation?  You would -- instead of extracting a

6    tooth -- and you wouldn't perform endodontic therapy,

7    either, would you, right away on such a person?

8         A.    Depends on the patient.  Sometimes you

9    can but sometimes they can't even take that.  It's

10   the same thing as if you're manipulating that tooth,

11   they are going to feel it.

12        Q.    So you give them some medication to help

13   ease the terrible pain and tell them to come back

14   when they are not quite in such terrible pain?

15        A.    That's one way of doing it.  Or you can

16   say -- you can try to project saying that let's just

17   schedule you back in four days to take a look at it,

18   you know.  Or you can say -- and you don't know if

19   it's definitive or not, let's give it a week.  So you

20   never know.  It depends on the patient.

21        Q.    Ever seen a patient with an abscess and

22   excruciating pain and the pain just wouldn't go away?

23        A.    Yes.

24        Q.    How did you -- and when I say "pain

WILLIAM SELMER, DDS                                    February 1, 2013
GEVAS v. McCANN

Page 21

1    wouldn't go away," pain wouldn't go away until either

2    extraction or a root canal.

3              Have you ever seen a patient like that?

4         A.    Yes.

5         Q.    Okay.  So in that situation, you still

6    have to do one of those, right; the root canal or the

7    extraction?

8         A.    Yes.

9         Q.    Okay.  What would happen if you didn't to

10   that sort of patient?  Could the pain go away?  Would

11   you anticipate that the pain would go away?

12        A.    It could.  It's possible.

13        Q.    Have you ever seen that happen?

14        A.    No, I didn't.  That would get me to being

15   specific to, basically, my patients and I can say

16   that it probably has happened, but I can't recall,

17   like, specifically who it happened to.

18              But I'm just saying being that there's a

19   whole gamut that runs when these situations occur, it

20   is possible that that can occur.  Have I seen it

21   happen?  I can't accurately say, "Well, I seen it

22   happen to two or three of my patients," but I'm sure

23   that it has happened because you treat patients

24   sometimes, you tell them just what's going on, and

WILLIAM SELMER, DDS                                February 1, 2013
GEVAS v. McCANN

Page 54

1    acute apical periodontitis?

2          A.    Nope.

3          Q.    How is that different?

4          A.    One is at the apex.

5          Q.    And what is acute periodontitis?  Where

6    is that?

7          A.    Periodontitis involves -- you might as

8    well say the -- more in the gums, how the gums relate

9    to the bone, and it doesn't have anything to do with

10   the pulp of the tooth.

11         Q.    So it's not that acute apical

12   periodontitis is a type of acute periodontitis.  It's

13   a different condition altogether?

14         A.    It's a different condition altogether.

15         Q.    Okay.  Is acute apical periodontitis,

16   aside from any directive, is that, in your dental

17   opinion, an emergency condition?

18         A.    The symptoms make it that.  He was in

19   pain.  So I'm just saying pain, period, is -- for

20   persons in pain, it's an emergency.

21         Q.    Okay.  So he was in pain, he's got acute

22   apical periodontitis, and you prescribed to him?

23         A.    "Pen VK 500 milligrams and Motrin

24   400 milligrams."

WILLIAM SELMER, DDS                          February 1, 2013
GEVAS v. McCANN

Page 55

1          Q.    Okay.  And it says, "next visit extract

2     No. 3"?

3          A.    Yes.

4          Q.    Does it say when that next visit is?

5          A.    No.

6          Q.    All right.  On January 30th, 2007, having

7     made this diagnosis and recommended extraction at the

8     next visit, also prescribed this medication, when

9     would you expect that he should come back?

10         A.    I wouldn't expect -- I can't --

11         Q.    What would you have rescheduled him for?

12         A.    Within that week I always try to say.

13    You know, give him time to try to finish the

14    medication and try to take it out.

15         Q.    Do you recall scheduling him?

16         A.    No.

17         Q.    But you think, based on this, you would

18    have scheduled him within a week?

19         A.    I would have scheduled him something that

20    would have fit that time frame.  Like I said --

21         Q.    Yeah, 8 to 10 days or whatever?

22         A.    I definitely would have tried to get him

23    in there.

24         Q.    Okay.  And that would be reflected --

WILLIAM SELMER, DDS                          February 1, 2013
GEVAS v. McCANN

Page 57

1        Q.    Hmm.  Interesting stuff.

2              Talk to me about the -- not the

3    appointment book.  What was the other one?

4        MR. TJEPKEMA:  Request.

5    BY THE WITNESS:

6        A.    Request.

7    BY MR. DONOHO:

8        Q.    Request Book.  I forget.  Did you ever

9    get requests yourself?

10       A.    The requests come to the Dental

11   Department.  Not specifically saying, Dr. Selmer,

12   this is a request for you.  No, they come to the

13   department.

14       Q.    And who actually physically receives

15   them, if not the dentist?

16       A.    They come in the mailbox and whoever

17   is -- the mailbox in the medical records.  Whoever is

18   over there, grabs them and brings them into the

19   office, and they get read and you see what the

20   problem is, you log it into the book.  And everybody

21   kind of shared that responsibility.

22       Q.    Including you?

23       A.    Including me.

24       Q.    The other dentists?

WILLIAM SELMER, DDS                                    February 1, 2013
GEVAS v. McCANN

Page 58

1         A.    Uh-huh.  Assistants, too.

2         Q.    And without that Request Book, you can't

3    really tell if any requests came in in February, for

4    example?

5         A.    As of today, no.

6         Q.    You don't recall any requests coming in

7    from Mr. Gevas?

8         A.    I can't remember back that far.

9         Q.    The next time you saw him after

10   January 30th, 2007, was June 5th, 2007?

11        A.    Yes.

12        Q.    According to these records?

13        A.    Yes.

14        Q.    Okay.  Is it the case that he -- well,

15   this is not the case where he can just go see a

16   different dental office.  He's only got your dental

17   office to go to, is that correct?

18        A.    He has Stateville's dental office to go

19   to where I worked at.  It wasn't my office.

20        Q.    Thank you for clarifying.  Okay.  Just

21   that one office?

22        A.    Yes.

23        Q.    Okay.  At any time -- well, here, let's

24   go back because we were talking about abscesses

ESQUIRE SOLUTIONS                              800.211.DEPO (3376)
                                               EsquireSolutions.com

WILLIAM SELMER, DDS                                    February 1, 2013
GEVAS v. McCANN

Page 97

1   extraction."

2              Do you see that?

3        A.    Uh-huh.

4        Q.         "Of this tooth at the next

5              visit but does not schedule the

6              patient for extraction until 3-28-09."

7              It's your testimony, however, as I

8   understand it, that based on what you saw in his

9   chart and what you're looking at at the X-ray, that

10  you probably did schedule him before that?

11       A.    I'm sure I scheduled him before that.

12       Q.    You're sure you did.  Yeah, okay.

13       A.    Just based upon how we did things

14  regularly there.  I mean, we wouldn't leave anybody

15  hanging that long with something that they needed

16  done like that, so....

17       Q.    Would you say that -- I keep losing this

18  wording -- acute apical periodontitis, would you say

19  that that is a

20                 "Serious dental infection

21            which had the potential to spread

22            to the maxillary sinus or the deep

23            veins in the brain"?

24       A.    Any infection has that potential.

WILLIAM SELMER, DDS                                February 1, 2013
GEVAS v. McCANN

Page 98

 1        Q.    And that's what acute apical

 2   periodontitis is?

 3        A.    I just said it's an infection, and any

 4   infection has that potential.

 5        Q.    It is an infection.  Acute apical

 6   periodontitis, that's an infection?

 7        A.    Yes.

 8        Q.    Okay.  Would you agree with the sentence

 9   further down where it says, you know, he's assuming

10   that you didn't appoint him, but you don't have to

11   worry about that.  You've already testified that you

12   probably would have.

13             But I just want to make sure whether you

14   agree with this.  Would you agree that

15                   "Failure to appoint his

16          patient within one week would

17          result in continuation of pain,

18          destruction of bone and gum tissue,

19          impair chewing, affect sleep, and

20          have the potential for very serious

21          infection in the body"?

22        A.    I think I agree with some of it.  You

23   know, like I said, any infection has -- in any

24   patient, it varies from person to person, so....

WILLIAM SELMER, DDS                                    February 1, 2013
GEVAS v. McCANN

Page 107

1    entry in the dental record from '05 involving Tooth

2    No. 3.

3                   Is there an earlier note from 10-24-05

4    involving that tooth as well?

5         A.    It is.

6         Q.    And that would further support this was a

7    chronic condition?

8         A.    Yes.

9         Q.    With regard -- when you were at

10   Stateville, did you only provide service to what I'd

11   call Stateville proper, behind the wall I think is

12   how it's described as well, or did you also provide

13   service at the NRC?

14        A.    Both, NRC and behind the wall.

15        Q.    Okay.  So you weren't there -- you

16   weren't behind the wall at Stateville every day?

17        A.    No.

18        Q.    If an inmate at Stateville was having

19   dental problems, is there a procedure for him to get

20   to be seen by the Dental Department?

21        A.    He'd write a request, send the request

22   through the health care unit channels, then it gets

23   to the Dental Department.

24        Q.    And then the Dental Department would

WILLIAM SELMER, DDS                                    February 1, 2013
GEVAS v. McCANN

Page 108

1    schedule an appointment for him to come in?

2          A.    Yes.

3          Q.    In your notes, there's no indication of

4    signs or symptoms of an infection, such as pus or

5    swelling, change in color or temperature.

6                If you had seen those things, would you

7    have indicated in your notes that they are present?

8          A.    Yes.

9          Q.    And since your notes don't indicate that,

10   does that mean you didn't see those things?

11         A.    I didn't see it.

12         MR. TJEPKEMA:  I don't have anything else.

13                    FURTHER EXAMINATION

14   BY MR. DONOHO:

15         Q.    Okay.  Now very good.  We should talk

16   about the 2005 entries.  Thank you.

17                First of all, whose handwriting is that,

18   if you know?

19         A.    Dr. Fishman.

20         Q.    And that's the 10-24-05 entry?

21         A.    Yes.

22         Q.    Can you read his writing?

23         A.    SOA.  "Complaint of sensitivity No. 3."

24         Q.    Wait.  Slow down.  I'm sorry.