# EXHIBIT G

```
     IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF ILLINOIS
             EASTERN DIVISION

DAVID C. GEVAS,         )
                        )
        Plaintiff,      )
                        )
    vs.                 )  No. 08 C 3074
                        )
TERRY McCANN, et al.,   )
                        )
        Defendants,     )
```

The Discovery Deposition of

DR. JACQUELINE MITCHELL, taken before RENEE C.

KERR, Certified Shorthand Reporter, in the

State of Illinois, County of Cook, at

Stateville Correctional Center, 16830 South

Broadway Street, Joliet, Illinois,

on the 25th day of March, A.D., 2013,

at 11 o'clock a.m.

Reported By:   Renee C. Kerr

License Number:   084-001508

1    evaluations of dentists in 2007?
2        A    Can I ask him a question before I
3    answer your question?
4        Q    Sure, but would I like to hear what
5    you say.
6        A    Okay.  Well, you can hear it.
7             Because he is Wexford, Wexford
8    dentists cannot write evaluations for State
9    dentists and State dentists cannot write
10   evaluations for Wexford dentists.
11       Q    So you told me the list of all the
12   different dentists; Selmer, Saffold, Fischman,
13   Garg, I think was the list -- there were only
14   four dentists?
15       A    At that time, yes.
16       Q    And those were all Wexford?
17       A    No.
18       Q    Which ones were an employee of the
19   State?
20       A    Dr. Fischman, Dr. Saffold, and
21   Dr. Garg.
22       Q    Oh, okay.
23            So Dr. Selmer was the only
24   Wexford employed dentist at that time?

...

1   A   Yes.
2   Q   So there was nobody that he wrote
3   written evaluations for then?
4   A   That would be correct.
5   Q   Okay.
6       Did anybody do written
7   evaluations of the other dentists?
8   A   Yes.
9   Q   Who?
10  A   The healthcare unit administrator.
11  Q   And who was that?
12  A   That would be me.
13  Q   I see. Okay. I would be remiss if I
14  didn't go back to Exhibit 2 again.
15  A   Okay.
16  Q   Because in Number 3 it says between
17  January 30, 2007 and June 5th, 2007,
18  Dr. Mitchell was administrator of the
19  healthcare unit at Stateville Correctional
20  Center; and, it says denied; and, you think
21  that is incorrect?
22  A   Yes.
23      MR. DONOHO:  I'm not sure if I need
24  to go one by one through all of these to see

1  if any of these are correct or not.
2         Chris, did you do this with any
3  help from her.
4         MR. WALTER: I ran it by her, but I
5  did a lot of it from documents. I definitely
6  made some mistakes, but I think on that one
7  especially, I think when we talked, you didn't
8  have any administrative role in the healthcare
9  unit itself, did you?
10        THE WITNESS: I was acting healthcare
11 unit administrator; but, I was not in dental.
12 BY MR. DONOHO:
13    Q    So as acting healthcare unit
14 administrator, I'm sorry, you did do some
15 evaluations of Dr. Saffold, Fischman and Garg?
16    A    Yes.
17    Q    Not Dr. Selmer?
18    A    That would be correct.
19    Q    What about -- okay. So look at 82
20 then on Exhibit 2. I am not sure if these --
21 what your position is on these now or IDOC's
22 position.
23        All right. Between -- Number
24 82. So it says in 2007 Dr. Mitchell was

```
 1   responsible for supervising and evaluating all
 2   assigned dental staff.  It says admit.
 3              So is that admit -- are you
 4   saying it should be admit except for
 5   Dr. Selmer?
 6      A    That would be correct.
 7      Q    I see.
 8              And what about 81?  Look at the
 9   prior one.  It says in 2007, Dr. Mitchell was
10   responsible for developing dental department
11   policies and procedures.  Denied.
12              Do you think that that is
13   correct?
14      A    I was acting healthcare unit
15   administrator.  So I wasn't directly in
16   dental, so that would be denied, yes.
17      Q    So you had no -- you did not work at
18   developing any procedures on training dental
19   staff?
20      A    That would be correct.
21      Q    That was what Dr. Selmer did or
22   should have been doing?
23      A    That would be correct.
24      Q    Was there a policy in Stateville in
```

1   2007 about whether root canal surgery could be
2   performed on molars?
3       A    Yes.
4       Q    What was the policy?
5       A    That root canals could not be
6   performed on molars.
7       Q    Ever?
8       A    Ever.
9       Q    Do you know where that policy is
10  written?
11      A    I think it's a Wexford policy.
12      Q    Does that Wexford policy also govern
13  IDOC dentists, State employees?
14      A    It was just a policy.  They didn't do
15  root canals on molars.
16      Q    Whether a Wexford dentist or a State
17  dentist?
18      A    State dentist.
19      Q    Where is that policy written?
20      A    It is in the Wexford manual.
21      Q    And that Wexford manual applies also
22  to State employees?
23      A    It's a service that's not provide.
24      Q    Does this Wexford manual dictate the

1  services the State employees can provide?

2     A   Pretty much.  Because they provide

3  the supplies.

4            (Document marked Exhibit 4 for

5            Identification as of 3/25/13.)

6  BY MR. DONOHO:

7     Q   On the front page of Exhibit 4, it

8  says Wexford Health Medical Policies and

9  Procedures.

10           If you turn towards the back,

11 there is a page called Den-7, and then at the

12 bottom, paragraph F, endodontic treatment,

13 root canal.

14           Do you see that?

15    A   Uhmm-uhmm, yes.  I'm sorry.

16    Q   It says endodontic therapy shall be

17 limited to front teeth which have good

18 periodontal support and enough remaining tooth

19 structure to restore.  Exceptions for

20 endodontic therapy are at the discretion of

21 the facility dentist.

22           Is this the rule you are

23 referring to?  I'm sorry.  I will ask that

24 again.

1          MR. WALTER:  You can answer the
2    question.  If you understand the question, go
3    ahead.
4          THE WITNESS:  Are you speaking in
5    reference to a root canal or any services?
6          MR. DONOHO:  Could you read the
7    question back?
8               (Record read as requested
9                by the Court Reporter.)
10         THE WITNESS:  Now, in respect to your
11   question, I think that that certainly is a
12   wonderful principle, but I think you also have
13   to look at situations, circumstances.
14               For instance, the patient may
15   want a platinum tooth.  The patient may want
16   orthodontic treatment.  Patient may decide
17   that I want all gold teeth.
18               That is his self-determination
19   and his right to autonomy.  Is that available,
20   no.
21   BY MR. DONOHO:
22      Q    Got it.
23               What about if the patient wants
24   root canal surgery to save an otherwise

1   savable tooth?

2   A   I think that, obviously, based upon

3   Wexford policy, they have a right, the dentist

4   has a right to evaluate the tooth, et cetera,

5   and make that decision.

6   Q   So when Dr. Selmer pulled --

7   A   Extracted.

8   Q   Excuse me.

9       (Continuing) -- extracted Gevas'

10  tooth, you are familiar with that's what

11  happened in this case?

12  A   Yes.

13  Q   He should have made some sort of

14  determination as to whether it was savable

15  under this principle?

16      MR. TJEPKEMA:   Objection.   It is

17  beyond the Subpoena; form, foundation.

18      MR. WALTER:   Calls for speculation.

19          You can answer.

20      THE WITNESS:   I think if he had

21  reviewed the records, it would have been

22  indicated that he had periodontal problems as

23  well as an existing very large abscess.   So

24  perhaps, and I can only say perhaps because I

Page 80

1  condition?  You think they are related?

2     A   Yes.

3           Acute you can't see.  Chronic

4  you can.

5     Q   And do the terms acute and chronic

6  have anything to do with the symptoms, like

7  what the patient feels in terms of pain?

8     A   Yes.

9     Q   Okay.  So at this point right here,

10  before the patient is feeling any pain, an

11  extraction was recommended.

12           Was it possible to foresee that

13  this would likely develop into the condition

14  we saw on the x-ray for January 30, 2007?

15           Would that be one reason to

16  recommend extraction; this is what is going to

17  happen; I can foresee it; let's pull it?

18     A   Yes.

19     Q   Have you ever seen a condition like

20  this in this x-ray that I am holding from

21  9-17-04 that did not progress into something

22  so serious as the one on the other x-ray of

23  January 30, 2007?

24          MR. TJEPKEMA:  Objection, form.

```
 1                    You can answer.
 2            MR. WALTER:  You can answer.
 3            THE WITNESS:  No.
 4            MR. DONOHO:  I forgot what I asked.
 5                Could you read back my question
 6   and her answer?
 7   BY MR. DONOHO:
 8       Q    Is there a way at this point on
 9   September 17, 2004, where root canal surgery
10   would have either been easier or more
11   effective than it would have been trying to
12   perform the same root canal surgery on
13   January 30, 2007?
14            MR. TJEPKEMA:  Objection; form,
15   foundation; calls for speculation; goes beyond
16   the Subpoena.
17            MR. WALTER:  You can answer if you
18   understand the question.
19            THE WITNESS:  Repeat it again.
20   Clarify it.
21            MR. DONOHO:  Can you read it back?
22                (Record read as requested
23                 by the Court Reporter.)
24            MR. TJEPKEMA:  Same objections.
```